SAMANTHA D. (ROWELL) COMMINS,
Individually and as Next Friend, Natural Parent
and Legal Guardian of N.C. and E.C., Minor Children,
and as Personal Representative and Ancillary Administratrix
of the Estate of SAMUEL JACK COMMINS, Deceased                    PLAINTIFF


v.


GENIE INDUSTRIES, INC.                                          DEFENDANT

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on the plethora of motions filed by Plaintiff and Defendant.

Defendant has filed: (1) a motion for summary judgment on Plaintiff's substantive claims (DN

164); (2) motions to exclude four of Plaintiff's expert witnesses (DN 157, 160, 161, 162); (3) two

motions to exceed page limits (DN 159, 166); and (4) a motion for partial summary judgment on

punitive damages (DN 167). Plaintiff has filed: (1) a motion to partially strike the testimony of

two of Defendant's expert witnesses (DN 169); (2) a motion to exceed the page limit (DN 182);

(3) a motion for leave to seal (DN 183); and (4) a motion for leave to file a sur-reply and to

supplement (DN 197). The motions are ripe for adjudication. For the reasons that follow: the

parties' motions to exceed the page limit (DN 159, 166, 182) and Plaintiff's motion for leave to

seal (DN 183) are **GRANTED**; Defendant's motion for summary judgment (DN 164) is

**GRANTED IN PART** and **DENIED IN PART**; Defendant's motion for partial summary

judgment (DN 167), all parties' motions to exclude each other's expert witnesses (DNs 157, 160,

161, 162, 169), and Plaintiff's motion for leave to file a sur-reply (DN 197) are **DENIED**.

# I.    BACKGROUND

In August 2014, Samuel Jack Commins ("Decedent") was hired as an electrician helper by Kellogg Brown & Root ("KBR").  (Def.'s Mot. Summ. J. 13, DN 164; Pl.'s Resp. Def.'s Mot. Summ. J. 4, DN 180).  On the night of September 25, 2015, Decedent was working with fellow employee David Sanchez ("Sanchez") installing supports and conduit beams at a facility using a Model S-85 boom lift ("S-85" manufactured by Defendant Genie Industries, Inc. ("Genie") to reach high places in the facility.  (Def.'s Mot. Summ. J. 3, 13; Pl.'s Resp. Def.'s Mot. Summ. J. 5; Berry Dep. 180:3-4, Aug. 15, 2018, DN 164-2).

Shortly after midnight, Sanchez left the worksite to work on another project.  (Sanchez Dep. 124:10-19, 126:15-20, Aug. 29, 2018, DN 165-15).  When Sanchez returned less than 30 minutes later, he found Decedent mortally wounded in the basket of the S-85, approximately 23 feet in the air pinned between the control panel of the basket and an overhanging beam.  (Sanchez Dep. 128:8-9, 134:18-23, 136:10-22).

On September 22, 2016, Plaintiff brought this products liability action against various defendants including Genie.  (Compl. ¶ 8, DN 1).  Plaintiff asserts products liability claims based on strict liability, gross negligence, and negligence against Genie.  (Am. Compl. ¶¶ 34-58, DN 68).

On July 7, 2019, Genie filed several motions:  (1) a motion for summary judgment; (2) motions to exclude four of Plaintiff's expert witnesses; (3) two motions to exceed page limits; and (4) a motion for partial summary judgment on punitive damages.  (Def.'s Mot. Summ. J. 41, DN 164; Def.'s Mot. Exclude Test. 33, DN 157 [hereinafter Def.'s Mot. Exclude Smith]; Def.'s Mot. Exclude Test. 25, DN 160 [hereinafter Def.'s Mot. Exclude Rasnic]; Def.'s Mot. Exclude Test. 16, DN 161 [hereinafter Def.'s Mot. Exclude Razer]; Def.'s Mot. Exclude Test. 10, DN 162 [hereinafter Def.'s Mot. Exclude Brady]; Def.'s Mot. Exceed Page Limit 2, DN 159; Def.'s Mot. Exceed Page Limit 2, DN 166; Def.'s Mot. Partial Summ. J. 25, DN 167).  On that same day,

Plaintiff moved to partially strike Genie's expert opinions. (Pl.'s Mot. Strike 22, DN 169). On September 17, Plaintiff moved to exceed the page limit and to seal her responses to Genie's motions for summary judgment. (Pl.'s Mot. Exceed Page Limit 4, DN 182; Pl.'s Mot. Seal 3, DN 183). Lastly, Plaintiff moved for leave to file a sur-reply and to supplement an expert witness' qualifications for this Court's consideration on Genie's motion to exclude the expert. (Pl.'s Mot. Leave File Sur-Reply & Suppl. 7, DN 197).

## II.     JURISDICTION

The Court possesses diversity jurisdiction over this matter as the Plaintiff is a resident of Alabama, Genie is a Washington corporation doing business in Kentucky, and the amount-in-controversy as pleaded exceeds $75,000, in this wrongful death suit. *See* 28 U.S.C. § 1332(a)(1); (Am. Compl. ¶¶ 2-5, 8).

## III.     DISCUSSION

### A.     Defendant's Motions to Exclude Expert Testimony/Plaintiff's Motion to Strike

Plaintiff's main contention in this products liability case is that the S-85 manufactured by Genie was defectively designed. In support of this assertion, Plaintiff claims that the S-85 should have been equipped with an "anti-entrapment device"—i.e., some kind of physical barrier or alert system to prevent an operator working in the basket of the lift from becoming pinned between the basket and an obstruction. (Pls.' Mot. Summ. J. 2). Before addressing Genie's summary judgment motions asserting in part that the S-85 was not defectively designed, the Court must determine whether the challenged expert testimony will be admissible at trial. Genie seeks to exclude four of Plaintiff's expert witnesses—Kevin Smith, Russ Rasnic, Steven Brady, and Chester Razer. Plaintiff correspondingly moves to partially strike the testimony of two of Genie's expert witnesses.

"Admissibility in federal court, including the admissibility of expert testimony, is determined by federal standards even when a case such as this one is tried in diversity." *Guthrie v. Ball*, No. 1:11-cv-333-SKL, 2014 WL 11581410, at *3 (E.D. Tenn. Oct. 10, 2014) (citing *Legg v. Chopra*, 286 F.3d 286, 290 (6th Cir. 2002)). Fed. R. Evid. 702 permits testimony relating to technical or specialized knowledge where it will assist the trier of fact to determine a fact in issue. As a prerequisite, such evidence must meet the following criteria:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)-(d); *see also* Fed. R. Evid. 702, Advisory Comm. Note to 2000 Amendment ("[N]o single factor is necessarily dispositive of the reliability of a particular expert's testimony.").

Under this rule, the trial judge is the gatekeeper to ensure that expert testimony satisfies the requirements of reliability and relevance. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). As the Sixth Circuit has further noted:

> Parsing the language of [Fed. R. Evid. 702], it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Third, the testimony must be reliable.

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008) (citations omitted). "Experts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience

of the discipline.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (second alteration in original) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (internal quotation marks omitted) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). "Rule 702 directs courts to focus on the reliability of expert testimony, rather than the 'credibility and accuracy' of that testimony." *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 323 (6th Cir. 2015) (quoting *Scrap Metal*, 527 F.3d at 529). "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

In *Daubert*, the U.S. Supreme Court identified a non-exhaustive list of factors a trial court may consider in evaluating an expert's proposed testimony. *Daubert*, 509 U.S. at 592. These factors include: "(1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Brooks v. Caterpillar Glob. Mining Am., LLC*, No. 4:14-CV-00022-JMH, 2016 WL 276126, at *2 (W.D. Ky. Jan. 21, 2016) (quoting *Daubert*, 509 U.S. at 592-94). "[T]he *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case. . . . *Daubert* factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" *Scrap Metal*, 527 F.3d at 529 (internal citation omitted) (citation omitted).

"It is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10). That being said, "[a]ny doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility." *In re E. I. Du Pont de Nemours & Co. C-8 Personal Injury Litig.*, 337 F. Supp. 3d 728, 739 (S.D. Ohio 2015) (citations omitted); *see also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) ("Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."). "[R]ejection of expert testimony is the exception, rather than the rule . . . ." *Scrap Metal*, 527 F.3d at 530 (citation omitted).

### 1. *Defendant's Motions to Exclude Expert Testimony*

### a. Kevin Smith - Engineer

Genie seeks to exclude the testimony of Kevin Smith ("Smith") because it believes that he lacks the requisite qualifications and experience in certain areas to opine as to whether the S-85 was defectively designed. (Def.'s Mot. Exclude Smith 18, 23-26; Def.'s Reply Mot. Exclude Test. 2-7, DN 191 [hereinafter Def.'s Reply Mot. Exclude Smith]). Genie further contends that the uncertainty about the specifics of the accident and Smith's method for reaching his conclusions render his opinions unreliable. (Def.'s Mot. Exclude Smith 18-21, 26-31; Def.'s Reply Mot. Exclude Smith 7-9, 12-14).

### i. Qualifications

Smith is a registered and licensed professional engineer with a bachelor's degree in mechanical engineering and a master's degree in mechanical and aerospace engineering specializing in design and manufacturing. (Def.'s Mot. Exclude Smith Ex. 45, at 3, DN 158-21 [hereinafter Smith Rep.]). Smith is a trained and licensed operator of boom-type mobile aerial

work platforms like the S-85. (Smith Rep. 3). Smith has 39 years of engineering experience related to the design, safety, operation, and testing of a broad spectrum of self-propelled aerial work platforms and truck mounted aerial work platforms, and has participated as a member of committees which have developed the nationally recognized safety codes and standards relating to aerial work platforms. (Smith Rep. 3). Smith currently provides consulting services in mechanical engineering safety. (Smith Rep. Ex. A, at 1). He worked as the principal mechanical engineer at Triodyne, Inc., a safety and design engineering firm that conducted investigations of consumer and industrial product-related accidents and design, safety analysis, and testing of machinery with consideration of human factors. (Smith Rep. Ex. A, at 3). Smith has an extensive history working for and volunteering at organizations specializing in engineering safety and giving lectures and producing papers on the topic. (Smith Rep. Ex. A, at 2-5).

Based on the Court's review, Smith has the pertinent educational and professional experience to proffer expert testimony in this case. Smith possesses scientific, technical, and other specialized knowledge that will help the trier of fact understand the evidence and determine factual issues. *See* FRE 702(a). He is aware of the industry's knowledge of and response to the issue of entrapment deaths, like the one at issue here, and also has knowledge of the feasibility of mandating the inclusion of an anti-entrapment device on all boom lifts. (Smith Rep. 10-42). Smith can assist the jury in understanding the world of boom lifts.

Genie attempts to discount Smith's experience with "secondary guarding devices"[1] by pointing to very nuanced and specific experiences that Smith does not have with these devices.

---

[1] Genie uses this term on the premise that "the primary means of avoiding entrapment and overhead hazards is the [S-85] operator, who, consistent with Genie's warnings and instructions, must evaluate the job site for potential overhead hazards, identify the overhead hazards, and avoid the overhead hazards." (Def.'s Mot. Summ. J. 8).

(Def.'s Mot. Exclude Smith 18, 23-26; Def.'s Reply Mot. Exclude Smith 1-7, 11). This same kind of argument was rejected in *Faughn v. Upright, Inc.*, No. 5:03-CV-000237-TBR, 2007 WL 854259 (W.D. Ky. Mar. 15, 2007). For example, Genie takes issue with Smith's inexperience with actually designing a secondary guarding device, similar to the Movants' argument in *Faughn* that the expert at issue "never designed aerial lift platforms." (Def.'s Mot. Exclude Smith 18); *Faughn*, 2007 WL 854259 at *2. As this Court noted, "[t]he law does not require that an admissible expert have every conceivable qualification, only that his background provides a proper foundation for testimony which will 'assist the trier of fact in understanding and disposing of issues relevant to the case.' . . . The law does not require [an expert to] be the most qualified expert conceivable . . . ." *Faughn*, 2007 WL 854259, at *1, 3. As in *Faughn*, Smith is "an engineer who intends to testify about . . . engineering aspects of a particular machine." *Id*. at *2. More importantly, Genie has not refuted the specific qualifications mentioned earlier that render Smith qualified to testify as an expert in this case. In sum, "[i]n a products liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight. In fact, courts have held that an expert witness need not have experience working in the specific industry he testifies about." *Id*. at *4 (internal quotation marks omitted) (citations omitted).

Genie attempts to unduly narrow the inquiry by discussing Smith's purported lack of experience with guarding devices. Smith is a veteran of the boom lift industry, which qualifies him to discuss safety features pertaining to boom lifts like the S-85. *See Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir. 2007) ("It is of little consequence to questions of admissibility that [an expert] lack[s] expertise in the very specialized area [the challenger defines] . . . ." (citations omitted)).

### ii.    Reliability

Courts apply the following factors in addressing a challenge in particular to an engineer's reliability:

> Did the expert attempt to construct or produce design drawings for suggested safety measures?  Did the expert test his suggested design changes?  Did the expert test the allegedly defective product?  Did the expert conduct the proper test and did the expert conduct that test properly?  Was the expert's opinion subject to peer review?  Have other manufacturers employed a design consistent with the expert's suggestions?  Did the expert consider the effect of his suggested design changes on the functionality of the product?  Did the expert develop his suggested product redesign only for purposes of litigation?  Did the expert consider all of the facts bearing on his opinion as well as industry standards?

29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6269.5 (2d ed. Aug. 2019 update) (citations omitted).

### (a)    Facts and Data Relied Upon

After being retained, Smith made two visits to the scene just more than a year after the incident.  (Smith Rep. 4, 6).  On the first visit, the subject S-85 was still in the position where it was at the time of the accident.  (Smith Rep. 4).  Smith took photos, videos, and measurements and operated the S-85 to check the travel, boom, and platform functions.  (Smith Rep. 4).  On the second visit, Smith inspected the S-85 and took photos.  (Smith Rep. 6).  In his report, Smith provides a factual summary of the accident based on his firsthand investigation and review of various discovery materials pertinent to this case, including testimony and exhibits.  (Smith Rep. 6-10).

Smith's disclosed opinions are based on sufficient facts and data.  *See* Fed. R. Evid. 702(b).  Smith examined the accident scene, operated the subject S-85, and took photos, videos, and measurements.  (Smith Rep. 4-6).  Included throughout the entirety of Smith's report are references to exhibits and the testimony of other individuals involved in this case.  (Smith Rep. 4-42).  Smith

also has provided industry data regarding the issue of entrapment deaths and the industry's response to it. (Smith Rep. 19-34).

Genie asserts that Smith lacks sufficient knowledge about the specific facts of the case to opine that an anti-entrapment device would have prevented the accident. (Def.'s Mot. Exclude Smith 20-21). Admittedly, there was no eyewitness to the fatal event. Regardless, making educated postulations as to what exactly happened is precisely what expert witnesses do. Though Genie provides a laundry list of circumstances about the accident which are unknown to Smith (and everyone else, for that matter), Genie does not explain how details beyond Smith's ken destroy the validity of his opinions. Throughout Smith's report, he cites to his firsthand investigation of the scene of the accident and supporting testimony and exhibits in the record. (Smith Rep. 4-42). Given that the industry and Genie itself tout the effectiveness of anti-entrapment devices no matter the circumstance, the uncertainty of the precise details of Decedent's demise does not preclude Smith's opinions. (Smith Rep. 22, 24-25, 27, 37; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 8, DN 180-9; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 9, DN 180-10). Genie's attempt to discredit Smith's use of other instances of entrapment deaths to support his opinion is similarly unavailing. In forming his opinion, Smith has relied on entrapment incidents to support his belief that entrapment issues were known in the industry. (Smith Rep. 20-34); *see* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

Genie argues that Smith must conduct his own personal testing to support his opinions. (Def.'s Mot. Exclude Smith 27-29; Def.'s Reply Mot. Exclude Smith 7). However, "[w]here [an expert's] method of reaching his conclusions is thoroughly tested and well accepted in the . . . engineering community, . . . actual testing on the [product] is unnecessary to satisfy the reliability

of [the expert's] opinion." *Faughn*, 2007 WL 854259, at *4. Smith's method of reaching his conclusions is based on accepted engineering safety principles and the boom lift industry's own identification, testing, and remedying of the entrapment death issue. Like in *Faughn*, personal testing is not required here. *See also Mackenzie v. JLG Indus., Inc.*, No. 3:13-CV-01046-TBR, 2014 WL 7375546, at *7 (W.D. Ky. Dec. 29, 2014) ("[T]esting is not a prerequisite to admissibility."); *Cummins ex rel. C.A.P. v. BIC USA, Inc.*, No. 1:08-CV-00019, 2011 WL 1399768, at *6 (W.D. Ky. Apr. 13, 2011) (An "alternative design that has been widely used in another product can be presumed to have been tested." (citations omitted)).

### (b)    Principles Relied Upon

Smith explains the engineering and safety principles he relied upon in generating his report. (Smith Rep. 10-17). Smith first discusses the widely adopted fundamental canon of ethics in engineering that "[e]ngineers shall hold paramount the safety, health and welfare of the public in the performance of their professional duties." (Smith Rep. 10-11). Expounding on this canon, Smith discusses the well-accepted standard of the "Hierarchy of Control" which is used "[t]o achieve the greatest effectiveness in product safety . . . ." (Smith Rep. 11-17). Smith correctly points out that one of Genie's employees, Senior Director of Product Safety Rick Curtin, has acknowledged the Hierarchy of Control. (Smith Rep. 17; Curtin Dep. 22:5-20, 212:17-219:4, Aug. 16, 2018, DN 157-3).

Genie's challenge to the reliability of Smith's opinion flies in the face of ample authority holding that an engineer may base his or her opinion in part on the Hierarchy of Control. (Def.'s Reply Mot. Exclude Smith 12-13; Pl.'s Resp. Def.'s Mot. Exclude Smith & Rasnic 28 n.7); *see, e.g.*, *Perau v. Barnett Outdoors, LLC*, No. 8:17-cv-550-T-JSS, 2019 WL 2145513, at *3-4 (M.D. Fla. Apr. 24, 2019) (admitting expert's opinion that a crossbow was defectively designed because

it did not provide an adequate safeguard that was "based primarily on the safety hierarchy, which is well established in the field of engineering . . . ." (citation omitted)); *Curbow v. Nylon Net Co., Inc.*, No. 07-3106-CV-S-JCE, 2008 WL 4186919, at *1-4 (W.D. Mo. Sept. 5, 2008) (admitting expert's opinion asserting defective design in golf frame and net without any padding on the frame based on safety hierarchy); *Hopkins v. Nat'l R.R. Passenger Corp.*, No. 08-CV-2965 (NGG) (RML) 2015 WL 13741721, at *7 (E.D.N.Y. Aug. 20, 2015) (recognizing that many federal courts "have found the Safety Hierarchy to be sufficiently reliable under *Daubert* and its progeny" particularly "in products liability or machine defect cases" (citations omitted)).[2]

Smith also references industry standards applicable to boom-supported elevating work platforms like the S-85. (Smith Rep. 18). Smith reveals that he is a member of ANSI standards committees for aerial work platforms that attempt to outline minimum requirements for the design and manufacture of aerial platforms, with the primary object to prevent accidents, which committees also include Genie employees. (Smith Rep. 18). Smith then discusses the aerial lift industry's knowledge about entrapment injuries and deaths. (Smith Rep. 19-20). Smith also cites the aerial lift industry's recognition of this issue and its response, which led to the creation of anti-entrapment devices. (Smith Rep. 20-34).

Finally, Smith applies the Hierarchy of Control and the industry's knowledge of and response to the issue of aerial lift injuries and deaths in concluding that the S-85 was defective for not possessing an anti-entrapment device. (Smith Rep. 34). Smith also refutes the bases for Genie's contentions that the S-85 is safe without an anti-entrapment device and notes that anti-

---

[2] The Court in *Hopkins* criticized one of the cases cited by Genie for the proposition that the Hierarchy of Control is an unreliable method, *Jaquillard v. Home Depot U.S.A.*, No. 10-CV-167 (JRH), 2012 WL 527421 (S.D. Ga. Feb. 16, 2012), to "have taken too narrow of a view of the Safety Hierarchy" because "[o]ther cases appear to have taken a broad view of the Safety Hierarchy as having universal application." *Hopkins*, 2015 WL 13741721, at *7.

entrapment technology was available at the time of the manufacture of the subject S-85. (Smith Rep. 35-42).

Smith's testimony is based on sufficient facts and data. *See* Fed. R. Evid. 702(b). Smith visited the accident site, operated the very S-85 involved here, and collected documentation, and he extensively references exhibits and the testimony of other witnesses in this case. (Smith Rep. 4-42). Smith also has provided industry data regarding the issue of entrapment deaths and the industry's response to it. (Smith Rep. 19-34). Smith's testimony is the product of reliable principles and methods, and he has applied his cited principles and methods to the facts of the case. *See* Fed. R. Evid. 702(c), (d). Smith has relied on an ethical canon for safety in product design anchored by the Hierarchy of Control adopted by a plethora of engineering societies. (Smith Rep. 10-17). Smith also relied on the industry's knowledge of and response to the issue of entrapment deaths in evidencing his conclusion that the S-85 was defectively designed for its failure to possess an anti-entrapment device. (Smith Rep. 18-45).

The *Daubert* factors identified in Wright & Miller concerning an expert's testing, methods, acceptance of opinion, and feasibility of opinion can be answered in the affirmative because of Smith's citation to and explanation of the industry's identification of and response to the issue of entrapment deaths. The only question that should be answered in the negative, i.e., whether the expert developed his suggested product redesign only for purposes of litigation, is answered in the negative—as Smith explained, anti-entrapment devices are widely used in the boom lift industry. While it is unclear how widespread Smith's view is that S-85s should *automatically* be fitted with an anti-entrapment device as a standard piece of equipment, any lack of consensus would not affect the application of the Hierarchy of Control and the industry's data to the reliability of Smith's opinion. Even if Smith's belief that anti-entrapment devices should be mandatorily included on

all boom lifts is not widely held, that conclusion was based on reliable methodology—i.e., application of widely accepted engineering principles and the history of the entrapment deaths in the boom lift industry. *See Daubert*, 509 U.S. at 594-95 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. . . . The focus, of course, *must be solely on principles and methodology, not on the conclusions that they generate*." (emphasis added)). Simply because Plaintiff does not identify another scholarly source specifically concluding that the lack of a guarding device on S-85s render them defective does not make Smith's opinion unreliable. More importantly, the boom lift industry's identification of and response to entrapment deaths before the sale of the S-85 at issue in this case supports Smith's opinion. (Smith Rep. 20-23).

In sum, Genie's motion to exclude Smith will be denied.[3]

### b. Russ Rasnic - Engineer

Genie also raises similar challenges to the proposed expert testimony of Russ Rasnic ("Rasnic"), whose opinion is that the S-85's lack of an anti-entrapment device caused Decedent's death. (Def.'s Mot. Exclude Rasnic 4-13, 15-23; Def.'s Reply Mot. Exclude Test. 1-2, 3-12, DN 192 [hereinafter Def.'s Reply Mot. Exclude Rasnic]).

### i. Qualifications

Rasnic is a 40-year veteran of the engineering industry who possesses both a bachelor's and master's degree in mechanical engineering. (Rasnic Rep. Ex. A, at 1). Since 2002, Rasnic has been employed as the director of the forensic division of Ryan Engineering, Inc. (Rasnic Rep. Ex. A, at 1). Rasnic is a certified aerial lift operator and trainer. (Rasnic Rep. Ex. A, at 2). Rasnic

---

[3] While Genie makes a one-sentence assertion that the inclusion of Smith's opinion alongside Rasnic's would be duplicative in violation of Fed. R. Evid. 403, this argument also lacks merit because Smith and Rasnic are testifying about different issues. (Def.'s Mot. Exclude Smith 31-32). Smith opines the S-85 is defectively designed, while Rasnic's opinions address causation. (Smith Rep. 42-45; Def.'s Mot. Exclude Test. Ex. 3, at 33, DN 160-3 [hereinafter Rasnic Rep.]).

has experience with evaluating anti-entrapment devices for litigation and accident investigation purposes. (Rasnic Dep. 175:23-185:11, Mar. 6, 2019, DN 158-20). Based on his educational background, Rasnic is qualified to offer expert testimony in this case.

Rasnic possesses scientific, technical, and other specialized knowledge that will help the trier of fact understand the evidence and determine a fact in issue. *See* Fed. R. Evid. 702(a). Rasnic is an experienced forensic engineer who has evaluated anti-entrapment devices on boom lifts and can explain the functionality of an anti-entrapment device. (Rasnic Rep. 8-12). Rasnic also conducted a real-life simulation of Decedent's accident in multiple scenarios, with and without anti-entrapment devices, which will potentially assist the jury in understanding an incident no one witnessed and in demonstrating anti-entrapment devices. (Rasnic Rep. 12-30).

As with Smith, Genie's first argument is that Rasnic's opinions are unreliable because he does not possess certain qualifications, such as a medical degree. (Def.'s Mot. Exclude Rasnic 4-5, 15-18; Def.'s Reply Mot. Exclude Rasnic 3-8). As before, "[t]he law does not require that an admissible expert have every conceivable qualification, only that his background provides a proper foundation for testimony which will 'assist the trier of fact in understanding and disposing of issues relevant to the case.' . . . The law does not require [an expert to] be the most qualified expert conceivable . . . ." *Faughn*, 2007 WL 854259, at *1, *3. Rasnic is a longtime forensic engineer with specific experience with boom lifts who will provide the jury with an opinion that the fatal injury was preventable with the use of an anti-entrapment device.

Genie's contention that a biomechanical degree is necessary to testify regarding causation is similarly unavailing. To the contrary, a forensic engineer can reliably consult and use biomechanical literature and principles to assist in forming opinions even without having a biomechanical degree. (Def.'s Reply Mot. Exclude Rasnic 3-5); *see Faughn*, 2007 WL 854259,

at *4 ("In a products liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications." (internal quotation marks omitted) (citations omitted)); *see also Burgett v. Troy-Bilt LLC*, No. 12-25-ART, 2013 WL 3566355, at *5 (E.D. Ky. July 11, 2013) (finding a mechanical engineer competent to testify regarding biomechanics).

### ii.     Reliability

After providing a detailed description of the S-85 and accident, and the materials relied in forming his opinions, Rasnic explains why he believes that an anti-entrapment device would have prevented Decedent's death. (Rasnic Rep. 6, 8). Rasnic begins by describing anti-entrapment devices, specifically, when they were created and by whom and how they work. (Rasnic Rep. 8-12). Rasnic then describes in detail the testing he did and the results of that testing to support his assertions. (Rasnic Rep. 12-30). Finally, Rasnic concludes his report by explaining how the results of his testing show that an anti-entrapment device more likely than not would have prevented Decedent's death. (Rasnic Rep. 30-34).

### (a)     Facts and Data Relied Upon

Rasnic's testimony is based on sufficient facts and data. *See* Fed. R. Evid. 702(b). Rasnic used the accident report, witness statements, photographs of the S-85 and accident site, and consulted with Smith in recreating the scene of the accident, running his tests, and coming to his conclusions. (Rasnic Rep. 6). Rasnic also gathered data about the S-85 and anti-entrapment devices in general to assist in running his simulations. (Rasnic Rep. 4, 8-12).

Genie attacks Rasnic's testing for its failure to encompass certain facts and to include specific data. (Def.'s Mot. Exclude Rasnic 5-12, 18-21; Def.'s Reply Mot. Exclude Rasnic 8-12). Genie's critique of the reliability of Rasnic's testing is unavailing. Much of Rasnic's device testing assumed a worst-case scenario—i.e., if the anti-entrapment devices worked in the worse-case

scenario, this would be probative of their functionality in a simulation of Decedent's death. (Rasnic Rep. 22-23, 26, 31). As before, Genie nitpicks details of Rasnic's testing that may have differed from the conditions of Decedent's accident. However:

> To be relevant, an accident reconstruction must be substantially similar to the original accident. Importantly, perfect identity between the experimental conditions and the actual conditions is not necessary. . . . Courts in the Sixth Circuit have acknowledged this standard, explaining that when an expert conducts testing which "purports to replicate actual events, the proponent of the evidence must show that the replication and the experiment are substantially similar. The closer the experimental evidence simulates actual events rather than demonstrates a scientific principle, the higher the foundational standard: the experiment and event must be sufficiently similar to provide a fair comparison."

*Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 405 (W.D. Ky. 2018) (internal quotation marks omitted) (citations omitted).

In this instance, Rasnic obtained an S-85 "of the same vintage as the accident machine" which he set up "with critical orientations taken from the after-accident inspection photos, [] [including] boom angle, boom extension distance, platform rotation and jib angle." (Rasnic Rep. 21, 15). Although the exact accident conditions are unknown, Rasnic attempted to ascertain the speed of the lift movement of the S-85 based on the machine's capabilities and the data available to him. (Rasnic Rep. 15). Rasnic also set up a test dummy in a position on the S-85 where Decedent was found consistent with the injuries he suffered. (Rasnic Rep. 16-20). Rasnic used scientific principles to simulate the human factors potentially present in the accident; for example, Rasnic consulted scientific literature to factor in reaction time and the pressure it would take to simulate Decedent's injuries. (Rasnic Rep. 13, 21). "When the *relevant elements* are sufficiently similar, . . . *other differences* are for defendants to highlight and the jury to weigh in its deliberations." *Jackson*, 326 F. Supp. 3d at 407 (emphasis in original) (citation omitted).

Although Genie goes to great lengths to highlight the unknowns in Rasnic's testing, it fails to show how those variables destroy the reliability of Rasnic's conclusion. Genie points out that while the accident site was graveled, Rasnic conducted his testing on a level concrete pad; yet Genie does not articulate why this difference matters. (Def.'s Mot. Exclude Rasnic 9). While Genie only emphasizes the differences between the simulation and the accident, Plaintiff has met her burden of showing the substantial similarity between the simulation and accident. Genie argues that the Overhead Protective Structure ("OPS") would not have saved Decedent's life if he were "standing outside the OPS' protective structure area"—based on the position Decedent was in when he died. However, Rasnic's simulations appear to have been based on the assumption that Decedent was within the protective radius of the OPS. (Def.'s Mot. Exclude Rasnic 20-21; Rasnic Rep. 15-22). "[W]ithout a persuasive argument from Defendant about why the various differences between the [accident] and the [simulation] are significant, the Court does not find that they are so great as to warrant exclusion for lack of substantial similarity." *Jackson*, 326 F. Supp. 3d at 407. Furthermore, "[i]n evaluating an expert witness, 'Daubert and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts on the case at hand . . . not that they know the answers to all the questions a case presents—even to the most fundamental questions.'" *Nemir v. Mitsubishi Motor Sales of Am., Inc.*, 6 F. App'x 266, 275 (6th Cir. 2001) (quoting *Jahn*, 233 F.3d at 390).

In concluding that the injuries, if any, that Decedent would have suffered had an anti-entrapment device been installed on the S-85 would not have killed him, Rasnic first obtained force measurements by consulting biomechanical literature and the medical examiner's report in addition to taking measurements from the simulated injuries to the test dummy. (Rasnic Rep. 21). Rasnic then tested each anti-entrapment device, finding that in each scenario, the dummy escaped

entrapment: In the use of a "Contact Alarm," the dummy was not entrapped or crushed and "could be moved freely from side to side, just as Genie has advertised"; in the use of the OPS Rasnic notes "the absence of any semblance of entrapment"; with the Overhead Protective Alarm ("OPA"), "[m]inor entrapment of the non-collapsible chest of the mannequin was observed, but it could still be moved from side to side, indicating what would likely have been some minor scraped or bruises to a human body, but certainly not forces great enough to cause compression asphyxia." (Rasnic Rep. 23, 24, 26). Rasnic generally concluded that had the Contact Alarm or OPA "been in place, [Decedent] most likely would have never been pressed hard enough against the control panel to cause compression asphyxiation, and could have either freed himself or survived until help arrived." (Rasnic Rep. 33). While it is true that Rasnic partly opined that the injuries suffered by Rasnic would not have caused death, a conclusion arguably better offered by a medical professional, Rasnic's conclusions in this regard were based on force calculations and measurements grounded in research and personal testing. *See Herrera v. Werner Enters, Inc.*, No. SA-14-CV-385-XR, 2015 WL 12670443, at *3 (W.D. Tex. Sept. 28, 2015) ("Over a dozen other federal courts have determined that biomechanical engineers *and mechanical engineers* are qualified to testify about the forces generated by accidents and the probable effects of such forces on the human body . . . ." (emphasis added) (citations omitted)); *see also Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014) (opining that mechanical engineer could "apply some common sense" in applying biomechanical issues and human factors to conclusions).

### (b) Principles and Methodology

Rasnic's testimony is the product of reliable principles and methods, and he has reliably applied the cited principles and methods to the facts of the case. *See* Fed. R. Evid. 702(c), (d). Rasnic attempted to simulate Decedent's accident multiple times using available information from

the incident. (Rasnic Rep. 12-30). He obtained a boom lift of the same make, model, and year as the one involved in the subject event and generally tested it to determine speeds, stopping, and overrun distances, as well as the drive speeds. (Rasnic Rep. 12). Rasnic then set up the simulated accident site similar to the actual accident location and used a test dummy to mimic Decedent. (Rasnic Rep. 15-17). Rasnic's first test "was to determine the mechanism by which [Decedent] became trapped." (Rasnic Rep. 17). Rasnic simulated Decedent's fatal injury by employing information about the accident gleaned by the coroner report and employing measurements and calculations based on the known information about the accident and scientific materials. (Rasnic Rep. 17-22). He then tested each entrapment device. (Rasnic Rep. 22-30).

In applying the Wright & Miller *Daubert* criteria to expert testimony by an engineer concerning allegedly defective products, the answers to much of that criteria support the admissibility of Rasnic's testimony because of the industry's identification of and response to the issue of entrapment deaths. Furthermore, Rasnic himself conducted tests of the S-85 with and without anti-entrapment devices. (Rasnic Rep. 12-30). The only Wright & Miller *Daubert* question that should be answered in the negative—i.e., whether the expert developed his suggested product redesign only for purposes of litigation, is answered in the negative. Rasnic indicates that the anti-entrapment devices he tested have already been developed, put into production, and sold by Genie and other boom lift manufacturers. (Rasnic Rep. 8-12).

Finally, Genie attempts to impugn Rasnic's opinion by pointing to testimony he provided in another case that "[i]t is not my opinion that [boom lift manufacturer]'s conduct was a direct cause of this entrapment." (Def.'s Reply Mot. Exclude Rasnic 2). Unadorned by the context in which that statement was made, Rasnic's prior testimony does not render inadmissible his opinions in this case.

Accident reconstruction is necessarily imprecise, especially absent witnesses to the event. Plaintiff has shown, however, that Rasnic's testimony is sufficiently reliable to meet the standards of expert witness scrutiny. Genie's motion to exclude Rasnic's opinions will be denied.[4]

### c.     Steven Brady – Computer Animationist

Genie seeks to exclude from evidence a computer depiction of the accident created by Steven Brady ("Brady") on the basis of unreliability. (Def.'s Mot. Exclude Brady 1).

Brady is a computer animationist. (Def.'s Mot. Exclude Test. Ex. 1, DN 162-1 [hereinafter Brady Discl. Statement]). Brady and his team created a series of video depictions of the accident and what would have happened had the S-85 been equipped with an anti-entrapment device. (Brady Discl. Statement 1). In developing their depictions, Brady and his team "worked at the direction of Plaintiff's testifying experts Russell Rasnic and Dr. Kent Harshbarger."[5] (Brady Discl. Statement 1).

The three-minute video depicts, the incident as if Decedent were in the basket of the lift, moving horizontally toward the beam that pinned him to the control panel, with his back to the beam and facing the control panel, and again as if he were moving diagonally upwards in the same position. (Brady Video 00:36-00:59). The video next illustrates the use of three anti-entrapment devices—the OPS, OPA, and Contact Alarm—and how each would have affected the two scenarios, the basket traveling horizontally and alternatively travelling diagonally upward. (Brady Video 1:00-2:24).

---

[4] As a final matter, Plaintiff seeks leave to supplement Rasnic's qualifications with an article that he has been published. (Pl.'s Mot. Leave File Sur-Reply & Suppl. 3-5). Because Rasnic is already deemed qualified, this motion will be denied as moot.

[5] Plaintiff retained Dr. Kent Harshbarger to provide an opinion regarding the injuries suffered and cause of death. (Pl.'s Resp. Def.'s Mot. Exclude Test. Ex. 1, at 2-3, DN 179-1).

Genie's first argument for excluding the video is that it is based on what Genie characterizes as Rasnic's "unreliable testing and guesswork . . . ." (Def.'s Mot. Exclude Brady 2-3, 5-7; Def.'s Reply Mot. Exclude Brady 1-4). Genie asserts that because Rasnic's opinion is unreliable, Brady's video depiction based in part on Rasnic's testing is correspondingly deficient. As the Court has already determined Rasnic's testing to be reliable, however, this argument is without foundation.

Genie next posits that Brady's video depiction should be excluded under Fed. R. Evid. 403 because it believes that any probative value the video possesses "is substantially outweighed by a danger of . . . undue prejudice, confusing the issues, [and] misleading the jury . . . ." Fed. R. Evid. 403; (Def.'s Mot. Exclude Brady 7-8; Def.'s Reply Mot. Exclude Brady 2, 11-12). Genie repeats that the video depiction is contaminated by Rasnic's objectionable testing. Having determined that Rasnic's simulations are admissible, this objection is likewise rejected. *Dugle v. Norfolk S. Ry. Co.*, No. 07-40, 2010 WL 2612331, at *2 (E.D. Ky. June 25, 2010) (animations must "be substantially similar to the actual conditions" for the animation to be admitted) (citation omitted).[6] Furthermore, to the extent Genie claims that the jury may be confused or prejudiced as to what Brady's video depicts—i.e., the actual accident versus Rasnic's belief as to how the accident happened—this confusion could be mitigated by the use of a limiting instruction. *See Oaks v. Wiley Sanders Truck Lines, Inc.*, No. 07-45-KSF, 2008 WL 4149635, at *2 (E.D. Ky. Sept. 4, 2008) ("[A] limiting instruction can cure any potential prejudice.").

For the reasons stated above, Genie's motion to exclude Brady will be denied.

---

[6] Although Genie summarily contends Plaintiff has not met has burden of showing that Brady's depiction accurately reflects Rasnic's testing, Rasnic disagrees. (Def.'s Reply Mot. Exclude Rasnic 4 n.4; Rasnic Rep. 33). Without any further specific argument from Genie on this point, there has been no showing that Brady's depiction does not accurately reflect Rasnic's testing.

### d.    Chester Razer – Safety Consultant

Finally, Genie seeks to exclude the expert testimony of Chester Razer ("Razer") from this case on reliability grounds. (Def.'s Mot. Exclude Razer 1). Razer has expressed opinions about the purpose and scope of the federal and state regulatory inspection report responding to the fatal accident and whether the findings, conclusions, and content from the accident report comport with regulatory standards. (Def.'s Mot. Exclude Test. Ex. 2, at 1, DN 161-2 [hereinafter Razer Rep.]).

Razer has 37 years of federal service with the Mine Safety and Health Administration ("MSHA"), the Occupational Safety and Health Administration ("OSHA"), and the United States Army. (Razer Rep. 3). Razer examined the incident report generated after that accident and the state and federal laws relating to that report. (Razer Rep. 4-16). In his report, Razer offers the following nine opinions:

> 1.    Kentucky [Occupational Safety Health] ("Kentucky OSH") was the appropriate agency charged with the responsibility of conducting this workplace-related fatality, and it conducted its inspection/investigation appropriately.
>
> 2.    Kentucky OSH provides an occupational safety and health program that meets OSHA's mandate of being *at least as effective.* This is evidenced by the fact that OSHA recognizes Kentucky OSH's state plan and has not initiated any activity designed to withdraw their plan.
>
> 3.    Kentucky OSH has conducted its investigation and inspection into this work-related fatal injury accident within the scope of its Field Operations Manual.
>
> 4.    Kentucky OSH's jurisdiction in this matter supersedes that of OSHA's (Federal OSHA) jurisdiction.
>
> 5.    Kentucky OSH and OSHA conduct inspections and issue citations, when warranted, to the employer (and only to the employer) whose employees are affected.
>
> 6.    No citations were issued or appear to have been warranted citing the operation of, or training in, the use of aerial lifts, in this case a Genie S-85. Upon review of the information provided in this matter, I do not find evidence sufficient to controvert Kentucky OSH's determination not to issue any citations to KBR or to find that KB[R] violated any applicable OSHA aerial lift standards.
>
> 7.    Neither the Occupational Safety and Health Act of 1970 or Kentucky OSH's State Plan give either agency the authority to conduct investigations into product design. Neither agency has the authority to issue citations to parties other than the employer of the injured employee.

8.      Kentucky OSH's Comprehensive FAME Report for FY 2015 lists no abnormalities that suggest gross irregularities in its state plan.

9.      Kentucky OSH's investigation and inspection into the workplace fatality of [Decedent] appears to be within the scope of KY OSH's authority, and I have not found any significant irregularities or malfeasance on its part.

(Razer Rep. 15-16 (emphasis in original)).

### i.      Relevance

Genie first argues that Razer's opinions do not comport with the relevancy requirements of Fed. R. Evid. 401 and 402 and the helpfulness requirement of Fed. R. Evid. 702(a). (Def.'s Mot. Exclude Razer 2, 6-10). "Relevant evidence is admissible . . . ." Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Razer's opinions here are relevant. First, Razer's opinions shed light on the comparative fault of others whose conduct may have plausibly contributed to the fatal accident. *See Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467, 473-77 (Ky. 2001); KRS 411.182. For example, Razer's testimony that no citations were issued to Decedent's employer would tend to militate against an attempt by Genie to deflect blame onto KBR. Second, Razer offers an explanation as to why Genie was not issued a citation in this case. Razer further explains that Kentucky OSH did not absolve Genie of liability; rather, Kentucky OSH simply does not have the authority to issue a citation to Genie. Finally, Razer's testimony is proffered to assist the trier of fact in navigating through a complex body of law that is otherwise unfamiliar to the general public.[7] *See Infiesta-Montana v. Cocca Dev., Ltd.*, No. 18-CV-4-R, 2019 WL 7630405, at *7 (D.

---

[7] Genie explicitly notes that it does not challenge Razer's opinions as impermissibly offering testimony on "ultimate issues" or "legal conclusions." (Def.'s Reply Mot. Exclude Razer 5).

Wyo. May 31, 2019) (allowing expert to "testify[] about the OSHA regulations relevant to the facts of this case. [The expert's] understanding of the interactions between OSHA's various regulations will assist the jury . . . ." (citations omitted)); *Adams v. New England Scaffolding, Inc.*, No. 13-12629-FDS, 2015 WL 9412518, at *5 n.3 (D. Mass. Dec. 22, 2015) ("Another example where expert testimony concerning the law is routinely admitted is in personal injury actions where the defendant is alleged to have violated a health or safety regulation. . . . Appellate cases have often noted the wide discretion afforded to trial judges to admit or exclude expert testimony, including expert testimony concerning the existence or application of a regulation. . . . [I]t is hard to see how such an issue could be litigated as a practical matter if no witness were permitted to mention the existence of the regulation or its application to the facts." (citations omitted)).

### ii. Cumulative and Unduly Prejudicial Evidence

Genie also challenges Razer's opinions as cumulative and unduly prejudicial under Fed. R. Evid. 403. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Genie's arguments are unavailing. Razer gives context to a regulatory accident report that the jurors may not fully understand without the proper context—which would reduce juror confusion. Genie points to the difference in standards between issuing an OSHA citation and finding a party negligent. The two are intertwined, however—whether a company receives a citation from OSHA arguably sheds light on whether that company was negligent. *See T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 530-33 (Ky. 2006) (consideration of whether federal law was violated in a common law negligence claim "was relevant to that inquiry"); *Taylor v. TECO Barge Line, Inc.*, 642 F. Supp. 2d 689, 693 (W.D. Ky. 2009) ( "violation of the OSHA general duty clause can be relevant

as to whether Defendant provided a reasonably safe place to work."); *see also Campbell v. Consol. R. Corp.*, No. 1:05-CV-1501 (GTS/GJD), 2009 WL 36889, at *3-4 (N.D.N.Y. Jan. 6, 2009) (rejecting the defendants' argument that "any discussion of OSHA regulations should be precluded as irrelevant under Fed. R. Evid. 401 [and 403]; rather, OSHA regulations are generally admissible as some evidence of the applicable standard of care.").

Furthermore, one opinion by an expert in federal and state regulatory law regarding an accident report does not rise to the level of being "cumulative." *See Vasquez v. Jones*, 496 F.3d 564, 576 (6th Cir. 2007) ("The mere fact that one other witness . . . has testified to a particular fact . . . does not render other testimony on that point 'cumulative.'" (citing *Stapleton v. Wolfe*, 288 F.3d 863, 865-66 (6th Cir. 2002))). Of course, whether evidence is cumulative is best reserved for trial because such a determination necessarily depends upon the order in which proof is presented. The only prejudice stemming from the admission of Razer's opinions is the potential damage it will cause to Genie's case, which is an insufficient reason to exclude evidence. *See Doe v. Claiborne Cty. By and Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 515 (6th Cir. 1996) ("'Unfair prejudice' means the *undue* tendency to suggest a decision based on improper considerations; it 'does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence.'" (citation omitted)).

### iii. Reliability

Finally, Genie challenges the reliability of Razer's opinion under Fed. R. Evid. 702 and *Daubert*. Razer and his testimony satisfy Fed. R. Evid. 702(a) because he possesses particularized knowledge about the workings of the federal and state regulatory systems regarding workplace accidents and may provide context to certain facts underlying the accident report. Razer's testimony is based on sufficient facts and data under Fed. R. Evid. 702(b)—although Razer did

not physically inspect the accident site himself or conduct an independent investigation of the accident, he relied on ample discovery material produced in this case, including testimony and photographs. (Razer Rep. 2). Razer's testimony is the product of reliable principles and methods under Fed. R. Evid. 702(c), particular OSHA and Kentucky OSH regulatory law. (Razer Rep. 4-15).

The Court also rejects the challenge to Razer based on his application of OSHA and Kentucky OSH regulations under Fed. R. Evid. 702(d). The reliability of Razer's conclusions is bolstered by the fact that of Razer's nine conclusions, Genie explicitly only disputes conclusion number six—i.e., that Razer "d[id] not find evidence sufficient to controvert [Kentucky] OSHA's determination not to issue any citations to KBR or to find that KB[R] violated any applicable OSHA aerial lift standards."[8] (Def.'s Mot. Exclude Razer 4-6; Def.'s Reply Mot. Exclude Razer 1). So, after questioning the reliability of Razer's opinions, Genie in its next breath affirmatively indicates that it does not dispute the vast bulk of those opinions.

Furthermore, Genie's attack on the reliability of and the methodology used by Razer in forming conclusion number six suffers from the same deficiencies as its previous attacks on Plaintiff's experts. As with other experts, Genie goes to great lengths to highlight purported deficiencies in the lack of testing or independent investigation conducted by Razer; as before, however, Genie does not explain why Razer's reliance on the discovery materials produced in this case is an insufficient basis by which he can render opinions as to the content of the OSHA report.

The rest of Genie's arguments seek inflexible application of *Daubert*. For example, Genie argues that Razer "has not submitted his opinions or 'methodology' to anyone for review." (Def.'s Mot. Exclude Test. Razer 14). Genie would seemingly require Razer to submit his report

---

[8] The Court is not ruling at this time regarding the admissibility of this discrete challenged opinion.

concerning application of safety regulations to the scientific community for peer review to determine if Razer is properly applying those regulations. However:

> While *Daubert* identifies several factors to consider for determining whether an expert's opinion is based on an acceptable methodology, these factors were not meant to be a definitive list of factors that must be met in order for an expert's opinion to be deemed reliable and thus admissible. As the Sixth Circuit has made clear, "[i]n some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" Opinions formed through "practical experiences . . . in [a particular] industry . . . do not lend themselves to scholarly review or to traditional scientific evaluation." But such evidence remains reliable under the guidelines established by *Daubert*, and the Sixth Circuit has unequivocally rejected arguments otherwise.

*Sierra Enters., Inc. v. SWO & ISM, LLC*, 264 F. Supp. 3d 826, 837 (W.D. Ky. 2017) (citations omitted). Razer is not required to gather reviews about his report in order for his opinions to pass scrutiny under Fed. R. Evid. 702 and *Daubert*. Genie's arguments predicated on an inflexible application of *Daubert* are overruled.

Genie's motion to exclude Razer will be denied.

### 2. *Plaintiff's Motion to Strike*

Plaintiff seeks to strike expert opinions as to Decedent's lost future earnings submitted by Genie. (Pl.'s Mot. Strike 1). Plaintiff retained vocational economist Sara Ford ("Ford") to provide an opinion as to Decedent's lost earning capacity. (Pl.'s Mot. Strike Ex. B, at 2, DN 169-2 [hereinafter Ford Rep.]). Genie retained vocational consultant Sharon Brown Lane and economist William T. Baldwin, Jr. to opine on that same topic. (Pl.'s Mot. Strike Ex. C, at 2, DN 169-3 [hereinafter Lane Rep.]); Pl.'s Mot. Strike Ex. D, at 3, DN 169-4 [hereinafter Baldwin Rep.]). Plaintiff seeks to prevent Lane and Baldwin from opining:

> 1. That Jack Commins['] future earnings should be calculated or compared in any way to "that of other Caucasian males of the same age and educational level, who have a work impairment or disability," including by reference to the BLS News Release; and

> 2. That Jack Commins['] future earnings should not account for the per diem or overtime wages he was able to earn before his death or that those earnings were unlikely to continue.

(Pl.'s Mot. Strike 15-16). Plaintiff does not challenge the qualifications of Lane and Baldwin, but rather the facts, data, methodology, and application used to arrive at their conclusions.

### a.    Sharon Brown Lane  - Vocational Expert

The report by Sharon Brown Lane ("Lane") describes the materials she relied upon, including her "experience in evaluating, counseling, and placing individuals in the competitive labor market; [a] consultation of documents and data commonly utilized in the practice of vocational rehabilitation; [the] results of evaluation measures and observations discussed [in her report]; and, a review of" a plethora of discovery materials pertinent to Decedent's earning capacity. (Lane Rep. 2-3). Lane then outlines all the relevant information about Decedent, including his age, education, and military training, finding that based on the specific combat training Decedent received, "[f]rom a vocational standpoint, [Decedent's] military training and experience is not transferable to the civilian workforce." (Lane Rep. 3-4). Lane then noted Decedent's work experience, which, apart from his military service, included only his position at KBR as an electrician helper. (Lane Rep. 4). Lane's report includes an evaluation of Decedent's "Pre-Morbid Functional Capacity," essentially a detailed examination of all of the physical and mental ailments Decedent experienced during his military service, and also analyzes Decedent's vocational attributes in concluding that his earnings at KBR represented his best earning capacity. (Lane Rep. 4-8).

Plaintiff takes issue with the following part of Lane's analysis:

> Considering [Decedent's] vocational profile and multiple physical and mental impairments, it is my opinion, vocationally, that his pre-morbid probability of participating and being employed in the competitive labor market was comparable

to that of other Caucasian males of the same age and educational level, who have a work impairment or disability. Furthermore, it is my opinion that this work life probability would have persisted over time until [Decedent] became eligible for Social Security retirement benefits.

(Lane Rep. 8-9). Plaintiff first criticizes Lane for not "offer[ing] any opinion, evidence, or data about when or to what extent Jack's 'disability' would actually reduce his earnings." (Pl.'s Mot. Strike 8). Lane was not tasked with calculating figures but rather identifying considerations for the jury in evaluating Decedent's lost earnings, factors vocational experts take into account when determining income potential. (Lane Rep. 8). Plaintiff also criticizes Lane's report for generally surmising that Decedent's future earnings can be compared "to that of other Caucasian males of the same age and educational level, who have a work impairment or disability." (Pl.'s Mot. Strike 15 (quoting Lane Rep. 7)). Lane identifies considerations that Ford did not make in calculating Decedent's lost earnings compared to other workers with similar characteristics. It appears that Lane is qualified to identify factors the jury can take into account when determining Decedent's lost earning capacity.

This Court addressed similar arguments against the admissibility of Lane's testimony in *Cummins v. BIC USA, Inc.*, No. 1:08-CV-00019, 2011 WL 3759415 (W.D. Ky. Aug. 25, 2011), a case involving a child with a severe burn injury in which Lane was retained to as to offer an opinion as to the child's lost income. *Id.* at *1-2. This Court rejected the challenge to the admissibility of Lane's opinions, stating:

> [T]he fact that Lane formulated damages based on government statistics from adults classified as being "not severely disabled," opposed to children with specific burn injuries, from the U.S. Census Bureau, the Department of Labor, and the Bureau of Labor Statistics [] goes to the weight of the evidence and not admissibility. Such a specific data set is not published by the government and the statistics used by Lane offer a reasonable means of comparison. Lane thoroughly reviewed [the child's] medical records as well as published medical materials. In light of her experience and background as a vocational expert witness for the U.S. Social Security Administration, U.S. Railroad Retirement Board, and the U.S. Department of

Labor, she has also provided a sufficient factual basis for concluding that [the child] suffers from a permanent partial disability. Lane's expert opinion based on her experience, research, and review of [the child's] medical records will assist the jury in this case. Accordingly, Defendants' motion to exclude Lane's testimony is denied.

*Id*. at *3. The same is true here. While Plaintiff takes issue with the lack of specifics in Lane's report regarding actual calculations tailored to Decedent's limitations, she points to nothing to support her assertion that Lane's conclusions are insufficiently detailed. Lane discussed in depth Decedent's physical and mental ailments, education, and work history, in conjunction with the factors that the U.S. Department of Labor and the U.S. Bureau of the Census consider when determining an individual's potential employment and compared Decedent's earning potential to that of similarly situated individuals.

Plaintiff's motion to prevent Lane from providing certain opinions at trial is denied.

### b.   Dr. William T. Baldwin - Economist

Dr. William T. Baldwin ("Baldwin") was retained by Genie "(1) to critique the analysis and projections of [Decedent's] earning capacity loss provided by [Ford] . . . and (2) to make reasonable independent projections of the earning capacity lost by [Decedent] due to his death." (Baldwin Rep. 3). Baldwin criticizes Ford's assumption that Decedent was a nondisabled individual, stating: "By using employment and work probabilities that are applicable to nondisabled males, [Ford] greatly exaggerated the earning capacity loss projections for [Decedent]." (Baldwin Rep. 5). Baldwin then describes why and how Ford's purported failure to consider Decedent's disabilities impact her calculations. (Baldwin Rep. 5).

Baldwin also opines that: "Including per diem pay increases in the age-earnings progression . . . results in an overstatement of the present value of [Decedent's] earning capacity loss." (Baldwin Rep. 5). Baldwin further identifies errors in Ford's report: (1) her failure to

articulate why she calculated fringe benefits at 8.4%; (2) her failure to account for the fact that salary would replace overtime wages as Decedent received promotions; and (3) her failure to account for potential employment changes by Decedent. (Baldwin Rep. 5-6). Baldwin concludes by describing in detail his calculations of Decedent's loss of earning capacity and his methodology for arriving at those figures. (Baldwin Rep. 6-12).

Plaintiff takes issue with a particular statistic that Baldwin relied on in accounting for Decedent's disabilities from the Bureau of Labor Statistics' Economic News Release ("BLS News Release"). (Pl.'s Mot. Strike 8-9, 11-15; Pl.'s Reply Mot. Strike 2, 3-7; Baldwin Rep. 5 n.3). Plaintiff argues that the BLS News Release is too unreliable as a foundation for Baldwin's opinion and that the specific statistic Baldwin used does not take into account the particular circumstances of Decedent's disability.

Plaintiff attacks the use of the BLS News Report in general because she believes Decedent does not fall within its contours. To be considered "disabled" for purposes of the study, a participant must have: been deaf or had a serious hearing difficulty; been blind or visually impaired, even with corrective lenses; had a significant physical mental or emotional condition; had serious difficulty walking, climbing stairs, bathing, or dressing. (BLS News Rep. 6-7, DN 169-5). The problem with Plaintiff's argument is that Decedent at least arguably may have fallen within the parameters of the study. In deciding to use the BLS News Report, Baldwin relied on Lane's finding that Decedent was disabled due to the multitude of physical and mental ailments affecting him, including "Post-Traumatic Stress Disorder and Adjustment Disorder with Anxiety[,] . . . 'extreme' symptoms from these conditions that made it 'very difficult' to perform his work[,] . . . multiple other chronic problems, including severe migraine-type headaches that

occur[red] on a frequent basis." (Baldwin Rep. 5; Lane Rep. 8). Other "chronic problems" that Lane identified included:

> Traumatic Brain Injury, History of Concussion, Memory Lapses/Loss, Late effect of intracranial injury, Headache Syndrome, . . . Pain in the left shoulder joint, Ankle Sprain, Limb Pain, Patellofemoral Syndrome, Back pain/Muscle spasms, Tinnitus, Sensorineural Hearing Loss on the right, Hypertension, and Bilateral Femoral Acetabular Impingement.

> Multiple radiologic imaging reports (at least nine), including X-rays, CT Scans, MRI's and MRI Arthrograms of [Decedent's] bilateral hip condition taken between March 28, 2013 and June 5, 2013, revealed a large CAM deformity, bilaterally; Necrotic-appearing tears of the superior anterior labrum; Full-thickness cartilage irregularity of the weigh-bearing surfaces; and Osteoarthritic changes.

(Lane Rep. 5). Lane further cited a multitude of other ailments, noting that Decedent on several occasions reported severe pain that was "easily aggravated" and that Decedent's "primary reason for [] separation from the military was noted as 'Disability.'"[9] (Lane Rep. 5, 7). Although much of the reporting of Decedent's ailments occurred while he was in the military, there is evidence that at least some of Decedent's ailments continued. For example, Sanchez, who was working with Decedent on the night of the accident, testified: "I had concerns about Jack's mental status. . . . Everybody knew that Jack had issues. Everybody knew to stay clear of Jack at times. It was just one of those things. . . . I knew that his situation was touchy, but I just coped, I just coped with him and dealt with him like everybody else does." (Sanchez Dep. 46:11-12, 47:11-13, 50:3-5). Based on the foregoing, there appears to be a foundation for Baldwin's opinion that the criteria for the BLS News Report applied to Decedent.

Plaintiff contends that experts cannot rely on general applications of statistics without tailoring them to the facts of the case, citing *Lackey v. Robert Bosch Tool Corp.*, No. 16-29-ART,

---

[9] Indeed, Decedent's military records reflect that he was considered 20% disabled. (Pl.'s Mot. Strike Ex. A, at 4, DN 169-1).

2017 WL 129891, at *10 (E.D. Ky. Jan. 12, 2017). The court in *Lackey* excluded an expert's testimony because there was no showing "that the [statistics relied upon by the expert] [could] be reliably applied to the facts of this case." *Id*. In other words, the proponent of the expert testimony there failed to do what Baldwin and Genie have done here—show that the BLS News Report could reliably apply to the facts of [that] case. *Id*. ("Perhaps there was a case to be made for the reliability of the [statistics relied upon]. But if there was, [the proponent] has not made it, and at the *Daubert* stage, the Court acts as gatekeeper, not advocate. . . . Despite these chances [to do so], [the proponent] never adequately explained why the [statistics relied upon] were a reliable basis for [the expert's] work-life projections.").

Plaintiff contests Baldwin's utilization of the labor force participation rate of 16.9% for disabled individuals with a high school degree across all ages and sexes. (Baldwin Rep. 5). Baldwin compared this statistic with the 65.6% labor force participation rate of non-disabled high school graduates to adjust Decedent's earnings based on a 25.76% figure. (Baldwin Rep. 5). Plaintiff argues:

> Baldwin's choice of statistics is . . . flawed because he chose to use an employment participation figure for all ages and genders, and not men of a similar age to Jack. Baldwin's 16.9 percent represents the labor participation rate of "disabled" persons 25 and over with a high school degree. But the BLS News Release shows that these numbers were grossly skewed by the inclusion of those over 65, who made up nearly half of the disabled population, and that women were more likely to be disabled than men.

(Pl.'s Mot. Strike 9). Baldwin's use of this figure does not render his testimony unreliable, however. The BLS News Report includes a breakdown of participants by sex, age groups, and even race. (BLS News Rep. 8). Plaintiff would have Baldwin use the statistical rate for a disabled 27-year-old in calculating Decedent's future earnings over the course of his career, while Baldwin appears to have averaged the statistical rates for all ages to reflect Decedent's employment over

the course of his entire life. (Baldwin Rep. 5). Regardless, "it is not proper for the Court to exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (citations omitted) (internal quotation marks omitted). "Vigorous cross-examination [and the] presentation of contrary evidence . . . are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

Plaintiff next argues that Baldwin inappropriately assumed that Decedent could have moved into a salaried position or changed to jobs offering less overtime and no per diem. (Pl.'s Mot. Strike 10, 15-19; Pl.'s Reply Mot. Strike 2-3, 8-10). Specifically, Plaintiff argues that Baldwin's refusal to incorporate Decedent's overtime and per diem pay he was earning at KBR throughout his entire work-life renders Baldwin's conclusions unreliable. Assumptions underlying future lost earning calculations are inherently imprecise because the future is impossible to predict. The foundations for Baldwin's projection can be tested by Plaintiff upon cross-examination, but are not so unreasonable to warrant exclusion.

### B.  Defendant's Motions for Summary Judgment[10]

Genie moves for summary judgment on all of Plaintiff's claims and separately moves for partial summary judgment on Plaintiff's claim for punitive damages.[11] (Def.'s Mot. Summ. J. 1; Def.'s Partial Mot. Summ. J. 1).

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as

---

[10] No challenges have been made to the parties' motions to exceed page limits and Plaintiff's motion for leave to seal. These motions will be granted.

[11] "Federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 416 (1996). The parties agree that Kentucky

a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

### 1. *Defendant's Motion for Summary Judgment on Plaintiff's Claims*

In Kentucky, "[a] party injured by a product can bring suit for that injury under three different theories: (1) breach of warranty under the Uniform Commercial Code, (2) negligence, or (3) strict liability in tort." *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 535 (Ky. 2003) (citing *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985)). In this case, Plaintiff has asserted

---

law supplies the substantive law governing this case. (Def.'s Mot. Summ. J. 20; Pl.'s Resp. Def.'s Mot. Summ. J. 18).

negligence, gross negligence, and strict liability products liability claims against Genie. (Am. Compl. ¶¶ 34-58).

"The 'sole question in a products liability case,' regardless of whether the case involves failure to adequately warn, defective design, or other products liability theories, is whether the product is defective." *Leslie v. Cincinnati Sub-Zero Prods., Inc.*, 961 S.W.2d 799, 803 (Ky. App. 1998) (citation omitted)). "Thus, like a claim for strict products liability, a claim for negligent products liability requires the plaintiff to establish that the product was defective and that it was the legal cause of the injury."[12] *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 747 (W.D. Ky. 2013).

> As the Kentucky Court of Appeals has explained:
>
> Courts have distinguished three types of product defect: (1) manufacturing defects or deviations from the product's design that create unreasonable risks of harm; (2) design defects or unreasonable risks of harm inherent in the product's design; and (3) warning defects or unreasonable risks of harm that could have been reduced or avoided by the provision of reasonable instructions or warnings.

*Edwards v. Hop Sin, Inc.*, 140 S.W.3d 13, 15 (Ky. App. 2003) (citations omitted)). Kentucky law treats the three theories of defects as giving rise to separate and distinct claims.[13] *Red Hed Oil,*

---

[12] Genie points out that Kentucky Revised Statutes ("KRS") 411.310 establishes a rebuttable presumption that a product was not defective if certain conditions are met. (Def.'s Mot. Summ. J. 20-21; Def.'s Reply Mot. Summ. J. 3). As Kentucky courts have explained, however, "[t]he statutory presumptions of KRS 411.310 do no more than leave the burden of proof with [the plaintiff] to prove that the [product] was defective." *Leslie*, 961 S.W.2d at 803 (citing *Ingersoll Rand Co. v. Rice*, 775 S.W.2d 924, 929 (Ky. App. 1988)).

[13] Genie moves for summary judgment in part on Plaintiff's product liability claims based on manufacturing and failure-to-warn defects. (Def.'s Mot. Summ. J. 21-24, 32-34; Def.'s Reply Mot. Summ. J. 1-2). Plaintiff has not attempted to argue a manufacturing or failure-to-warn defect in any way in her response to Genie's motion for summary judgment, nor has Plaintiff otherwise furthered these claims, which are therefore dismissed. *See Whybark v. Synthes, Inc.*, No. 5:15-CV-00084-GNS-LLK, 2017 WL 1788673, at *2-3 (W.D. Ky. May 4, 2017) (dismissing plaintiffs' design defect and failure to warn claims for providing no response to defendant's request for summary judgment on these claims).

*Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 772 (E.D. Ky. 2017) (citing *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 79 (Ky. 2010)).

In evaluating on the merits of Genie's summary judgment motion, the Court must determine if Plaintiff has presented proof of a triable issue: (1) whether the S-85 was defectively designed at the time it was sold; and (2) whether the S-85's alleged defective design caused Decedent's death. *See Ostendorf*, 122 S.W.3d at 535 (identifying that the defect is examined through the lens of "what the manufacturer knew or should have known *at the time the product was sold.*" (emphasis in original) (citations omitted)); *Holbrook v. Rose*, 458 S.W.2d 155, 157 (Ky. 1970) ("A plaintiff's . . . claims of negligence . . . and strict liability . . . have [a] common denominator which is that causation must be established.").

Plaintiff's main contention regarding her defective design claim is that the S-85 should have been equipped with an anti-entrapment device. (Pl.'s Mot. Summ. J. 2). Genie acknowledges the existence of these safety devices when the subject boom lift was sold. (Def.'s Mot. Summ. J. 7). The OPS attaches to the basket of the S-85 and "provides [] protection for operators in the event of contact with an overhead obstacle in certain applications." (Def.'s Mot. Exclude Smith Ex. 14, at 1). The OPA, on the other hand, "alert[s] ground personnel when an operator makes contact with the platform control panel by interrupting boom movement, sounding an alarm[,] and causing a light to flash." (Def.'s Mot. Exclude Smith Ex. 14, at 1). The OPA utilizes "a pressure sensitive horizontal bar that is fitted at around waist height below the boom lift's control panel. When pressure is placed on the bar, as may be the case if an operator makes contact with an overhead obstacle, the system is activated." (Def.'s Mot. Exclude Smith Ex. 14, at 1). Genie acknowledges that these devices existed "[l]ong before [Decedent's] accident," but were optional retrofits that could be purchased at the request of a customer. (Def.'s Mot. Summ. J. 7, 9). Plaintiff

has also proffered a third anti-entrapment device, referred to as "Skywire," which Genie knew about in 2008 and rejected for use on its products.  (Pl.'s Resp. Def.'s Mot. Summ. J. 8-10; Def.'s Mot. Exclude Test. Ex. 45, at 40, DN 158-21 [hereinafter Smith Rep.]; Def.'s Mot. Exclude Test. Ex. 16, DN 157-18 [hereinafter Def.'s Mot. Exclude Smith Ex. 16]).  The Skywire "consist[s] of a wire stretched in front of the control panel of the basket.  If the operator is pressed forward from contacting an overhead obstruction, the wire will be tripped and the machine will stop immediately . . . ."  (Pl.'s Resp. Def.'s Mot. Summ. J. 8; Smith Rep. 21, 32).  Plaintiff asserts that the S-85 was defectively designed for not including some sort of anti-entrapment device.

### a.     Defective Design

Under Kentucky law, a product design is defective if it creates such a risk of injury that an ordinarily prudent manufacturer, being aware of the risk, would not have put it on the market.  *C & S Fuel, Inc. v. Clark Equip. Co.*, 552 F. Supp. 340, 344-45 (E.D. Ky. 1982); *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980)).  "The maker is not required to design the best possible product or one as good as others make or a better product than the one he has, so long as it is reasonably safe." *Sturm, Ruger & Co., Inc. v. Bloyd*, 586 S.W.2d 19, 21-22 (Ky. 1979).  Genie makes several arguments in support of its assertion that the S-85 was not defectively designed as a matter of law.

Simply put, there are genuine issues of material fact in this case as to whether the S-85 was defectively designed which preclude summary judgment for Genie.  The design of the S-85 allows for an operator to move the machine from the basket while his back is turned to obstructions.  A jury could find that the speed at which the basket of the S-85 moves and its inertia create an unreasonable risk of injury while operating the lift.  (Def.'s Mot. Summ. J. 3-4; Smith Rep. 4; Rasnic Rep. 15).  Plaintiff has produced evidence that as early as 1994, Genie's own warnings

identified the risk of crushing injuries while operating a S-85 from the basket, including the S-85 at issue in this case. (Smith Rep. 20, 23). Members of the boom lift industry identified the issue of entrapment at least two years before the subject S-85 was sold in January 2010. (Smith Rep. 19, 21-22). Seven cases of serious injuries or death from entrapment involving a Genie product occurred between 2003 and January 2010, and several other cases involving similar products from other companies occurred during that period. (Smith Rep. Ex. D, at 1-2). Before the S-85 at issue was sold, Genie was presented with a device that could prevent entrapment, which it rejected. (Def.'s Mot. Exclude Smith Ex. 16, at 1-2).

After the sale of the subject S-85, the industry continued to identify, promote awareness of, and remedy the risk of entrapment. (Smith Rep. 23-33). Between the sale of this S-85 and Decedent's death, there were several more cases of serious injury and death from the use of similar equipment, including Genie products. (Smith Rep. Ex. D, at 2-4). Genie itself explored remedying the entrapment danger in late 2011, after eight months earlier asking the International Powered Access Federation, an organization that sets industry standards for boom lifts, not to release a publication that highlighted entrapment deaths. (Smith Rep. 24; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 6, at 2). Genie finally employed anti-entrapment products as optional retrofits in late 2011, 2012, and 2014, after several other companies created similar devices before and during that period. (Smith Rep. 22-31). Genie announced the creation of a different anti-entrapment device in 2017. (Smith Rep. 33).

Smith explained how the design of the S-85 fails to comport with engineering safety standards. (Smith Rep. 10-17, 34-35). Rasnic explained how, after testing the S-85 and simulating the subject accident with and without anti-entrapment devices, he believes an anti-entrapment device would have saved Decedent's life. (Rasnic Rep. 30-34). Indeed, Genie's own testing

reveals the success of the OPS. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 25, DN 180-26). Apart from Rasnic's simulations, Genie and the industry have touted the effectiveness of anti-entrapment devices. (Smith Rep. 27, 30-32, 35; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 8, DN 180-9).

In the face of these facts, Genie has not established as a matter of law that the S-85 was not defectively designed. Viewing the facts most favorably to the non-moving party, the defect in the S-85 can be characterized as the ability to operate the S-85 from the basket with one's back toward an obstruction, such that the operator can be crushed between the basket of the S-85 and the obstruction. A reasonable jury could find that a "prudent manufacturer of similar products fully apprised of the condition and tendencies of the [S-85] when [] put [] into the stream of commerce" would not have sold the S-85 because of that risk. *Nichols*, 602 S.W.2d at 433 (citation omitted).

### b. Causation

Genie also contends that Plaintiff cannot satisfy the causation element of her products liability claim. (Def.'s Mot. Summ. J. 2, 34-40; Def.'s Reply Mot. Summ. J. 2, 11-14). To be clear, "[a] plaintiff's . . . claims of negligence . . . and strict liability . . . have [a] common denominator which is that causation must be established." *Holbrook v. Rose*, 458 S.W.2d 155, 157 (Ky. 1970). "The causation analysis is the same under a negligence theory in a products liability case as . . . under a strict liability theory." *Red Hed Oil*, 292 F. Supp. 3d at 773 (internal quotation marks omitted) (quoting *Halsey v. AGCO Corp.*, No. 16-cv-461-JMH, 2017 WL 4767679, at *1 (E.D. Ky. Oct. 20, 2017)). To prove causation in a products liability case in Kentucky, the "plaintiff has the burden . . . to establish causation under the substantial factor test— that is, plaintiff must prove that defendant's conduct was a substantial factor in bringing about a plaintiff's harm." *Id.* (quoting *King v. Ford Motor Co.*, 209 F.3d 886, 893 (6th Cir. 2000)).

As the Sixth Circuit has explained, "expert testimony is required in a products liability case only when the subject presented is so distinctly related to an area that is so far removed from the grasp of the average lay person." *Stevens v. Keller Ladders*, 1 F. App'x 452, 458 (6th Cir. 2001) (applying Kentucky law) (citation omitted). "Expert testimony may be required in cases in which the question is of a complex and technical nature such that a lay juror could not, without the aid of the expert, infer that a defective condition of the product caused the product's failure and caused the injury to the plaintiff." *Id.*

Genie argues that, because this was an unwitnessed accident, causation can only be proved through conjecture and speculation. (Def.'s Mot. Summ. J. 36-39). This contention would largely eviscerate the practice of accident reconstruction and preclude such testimony in cases involving unwitnessed accidents. Furthermore, the precise details preceding this accident are of little import, as least according to Plaintiff. As explained by Smith and Rasnic, anti-entrapment devices are supposed to prevent an operator from being crushed no matter the circumstance because such risks are inherent in the general operation of the S-85. (Smith Rep. 20, 23). Moreover, Plaintiff has eliminated other potential causes giving rise to Decedent's accident—for example, there is no proof of any manufacturing defect. (Def.'s Mot. Summ. J. 2; Def.'s Reply Mot. Summ. J. 1).

Based on the facts as articulated above, a jury could also reasonably find the design of the S-85 allowing entrapment was a "substantial factor in bringing about" Decedent's death. *Red Hed Oil*, 292 F. Supp. 2d at 773 (citations omitted). Genie urges that Plaintiff has presented no competent expert to testify on causation. (Def.'s Mot. Summ. J. 35-36). As explained above, however, the Court has deemed Rasnic an appropriate expert to testify regarding causation. Furthermore, like expert testimony of design defects, expert testimony on causation is not always needed in a product liability case. *See Jarrett v. Duro-Med Indus.*, No. 05-102-JBC, 2008 WL

89932, at *6 (E.D. Ky. Jan. 8, 2008) ("In products liability cases, expert witnesses are generally necessary to prove such matters as product defect and proximate causation, '*unless* of course the nature of the defect and the resultant injuries are so obvious as to fall within the general knowledge of the ordinary person.'" (emphasis added) (quoting *Honaker v. Innova, Inc.*, No. 1:04-CV-132(M), 2007 WL 1217744, at *2 (W.D. Ky. Apr. 23, 2007))). The crushing effect on a human body caught between an industrial boom lift and the underside of a fixed structure in the absence of an anti-entrapment device would appear to fit the category of injuries which are so obvious that an ordinary person would not require an expert to explain the element of causation.

The evidence presented in this case sufficiently creates a genuine issue of material fact as to whether the S-85's defective design was responsible for Decedent's death. *See Holbrook v. Rose*, 458 S.W.2d 155, 158 (Ky. 1970) (evidence must establish "a reasonable probability" that a defect in the product was responsible for the harm) (citation omitted).

### c.      Liability of Others

Genie claims that other parties are to blame for Decedent's death. (Def.'s Mot. Summ. J. 1-2, 4-7). Specifically, Genie argues: (1) Decedent should not have been operating the S-85 because he was not trained, authorized, or qualified to operate that machine, he violated Genie's warnings and instructions and KBR's safety policies in doing so, and he should have been more careful; (2) the S-85 was maintained in such poor condition that it should not have been in use; (3) KBR chose not to purchase the optional secondary guarding device that was available for retrofit before Decedent's death. (Def.'s Mot. Summ. J. 1-2, 4-7, 8-9, 11-13, 15-17, 26-31; Def.'s Reply Mot. Summ. J. 1-2, 9-10). All of Genie's attempts to shift blame to other parties are unavailing in the face of Kentucky's application of the principle of comparative fault.

The Kentucky Supreme Court in *Owens Corning Fiberglas Corp. v. Parrish* discussed comparative fault in the context of products liability actions. The court held that in products liability cases fault must be apportioned among all parties, including the plaintiff, whose conduct has a causal connection to the alleged harm suffered by the plaintiff. *Parrish*, 58 S.W.3d at 470. "'Fault' includes acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability." *Id*. at 473 (quoting Unif. Comparative Fault Act note 10 at § 1(b), 12 U.L.A. 123 (Cum. Supp. 2000)). Genie's contention that the actions of other parties preclude the imposition of liability on itself are unavailing because the principle of comparative fault holds all actors contributing to a plaintiff's harm are to be apportioned their respective fault. *Id*. at 481.

Genie argues that the negligence of other parties involved in this case are superseding causes that break the chain of causation relating to Genie's actions. (Def.'s Mot. Summ. J. 39-40). "A long line of Kentucky cases makes clear that a superseding cause is 'an act of a third person or other force which by its intervention prevents the actor from being liability for harm to another which his antecedent negligence is a substantial factor in bringing about.'" *Briscoe v. Amazing Prods., Inc.*, 23 S.W.3d 228, 229 (Ky. App. 2000) (quoting *Donegan v. Denney*, 457 S.W.2d 953, 958 (Ky. 1970)). "A superseding cause is a factor of such extraordinary, unforeseeable nature as to relieve the original wrongdoer of liability to the ultimate victim." *Briscoe*, 23 S.W.3d at 229 (citing *Montgomery Elevator Co.*, 676 S.W.2d at 780). Genie's position on this point is without merit. The creation of the anti-entrapment device by the boom lift industry before this S-85 was sold supports the foreseeability of operators getting crushed in the basket of a boom lift without a protective device. Moreover, the actions of the other actors in this case and the effects of those actions on the resulting injury is a comparative fault question for the jury. *See Parrish*, 58 S.W.3d

at 479 ("If . . . the evidence does not permit apportionment of the damage between separate causes, then comparative fault principles apply, and the trial court should instruct the jury to apportion damages according to the proportionate fault of the parties."). It is certainly not unforeseeable that an employee may use a piece of equipment without adequate training, or that an employer may poorly maintain a piece of equipment. (Def.'s Mot. Summ. J. 39-40); *see Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516, 521 (Ky. 1968) ("[T]he misuse or failure to follow directions may be foreseeable." (citation omitted)).

### d.    Industry and Regulatory Standards, and Industry Practice

Genie next posits that the S-85 satisfied all applicable industry and regulatory standards and its design was consistent with industry practice. (Def.'s Mot. Summ. J. 2, 4, 9, 17, 29; Def.'s Reply Mot. Summ. J. 1-2, 7-9). To the extent that Genie argues that its purported compliance with industry standards absolves it of liability in this case as a matter of law, Kentucky's highest court in *C.D. Herme, Inc. v. R. C. Tway Co.*, 294 S.W.2d 534 (Ky. 1956), flatly rejected this notion:

> As we conceive it, the reasonableness of the care has relation to the accomplishment of the end to be achieved, namely, a reasonably safe product. This in turn has relation to the risk involved if the product is not safe. *The test is not what other manufacturers are doing, or what is customary in the trade or industry*. Prosser says:
>
>> "Even an entire industry, by adopting careless methods to save time and effort or money, cannot be permitted to set its own uncontrolled standards. And if the only test is to be what has been done before, no industry will have any great incentive to make progress in the direction of safety."

*Id*. at 537 (citations omitted). As the Kentucky Supreme Court recognized in *Nichols*, a manufacturer's compliance with or deviation from industry standards in the design of a product is a relevant factor, but is not conclusive in determining whether a product is defective. *Nichols*, 602 S.W.2d at 433.

### e. Availability of Optional Safety Device

Genie also asserts that anti-entrapment devices, including those Plaintiff claims should have been included on the S-85, were available for optional purchase. (Def.'s Mot. Summ. J. 2, 7, 11-13, 26-30; Def.'s Reply Mot. Summ. J. 1-2, 9-10). Genie argues that KBR or some other relevant actor's failure to purchase available guarding devices to prevent Decedent's injury exculpates Genie.

As before, to the extent Genie attempts to blame another party for that party's failure to make the S-85 safe, that is an argument for apportionment of liability under the principle of comparative fault, not an excuse for Genie's fault. Further, to the extent Genie argues that a customer's failure to purchase and install optional safety equipment cuts off a manufacturer's liability for purported design defects, Kentucky law is directly opposite.[14] (Def.'s Mot. Summ. J. 26-31); *see Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 782 (Ky. 1984) ("[A]s a general rule the purchaser's failure to remedy a defect in the product is no defense for the manufacturer where the claim is based on the defective condition of the product at the time of manufacture and is made on behalf of an ultimate user . . . who has not been adequately warned of the danger. The manufacturer has a non-delegable duty to provide a product reasonably safe for its foreseeable uses, a duty not abrogated by warning to the immediate purchaser."); *see also*

---

[14] Genie also proposes that Plaintiff cannot prove that an alternative design would have prevented Decedent's death. (Def.'s Mot. Summ. J. 31-32; Def.'s Reply Mot. Summ. J. 2, 11). "[C]ourts in Kentucky generally require a plaintiff to prove that a safer, feasible design alternative was available to the manufacturer when it made the product." *Naise v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 745-46 (W.D. Ky. 2013) (citations omitted). "It is well-settled that Plaintiffs are required, by way of expert testimony, to provide proof of an alternative design through 'competent evidence' that there was available to Defendant a 'practicable, feasible, safer, alternative design' at the time of manufacturing." *Estate of Bigham v. DaimlerChrysler Corp.*, 462 F. Supp. 2d 766, 776 (E.D. Ky. 2006) (citation omitted). Plaintiff has proffered evidence that a feasible anti-entrapment device would have prevented Decedent's death, which has been ruled admissible above. (Rasnic Rep. 3, 8, 10 n.3, 23, 25-26, 28, 30, 32-33).

*Jordan v. Massey-Ferguson, Inc.*, 100 F.3d 956, 1996 WL 662874, at *4 n.1 (6th Cir. 1996) (citing *Pike v. Benchmaster Mfg. Co.*, 696 F.2d 38, 41-42 (6th Cir. 1982), as holding "that the defectiveness under Kentucky law of a press which could be activated unwittingly and which lacked an optional safety device was a jury question.").

### f.        Duty to Retrofit

Genie also appears to contend that it had no duty to retrofit, or add an anti-entrapment device after it sold the boom lift.  Although the Kentucky Supreme Court in *Ostendorf v. Clark Equipment Co.* refused to adopt a specific duty to retrofit, it did so recognizing "that duty is superfluous in light of existing negligence and product liability doctrines." *Ostendorf*, 122 S.W.3d at 535 (citations omitted).  *Ostendorf* held that the absence of the safety device at the time of sale is already a relevant factor in determining whether a product has been defectively designed to impose liability against the manufacturer. *Id*.  Genie cannot escape liability simply because it later made available for purchase an optional safety upgrade that could have prevented this injury.  The relevant inquiry is whether the absence of the safety upgrade *at the time the S-85 was sold* renders the S-85 defectively designed.

Genie additionally argues that guarding devices "can be useful tools in some environments, [but] can negatively impact utility in others."  (Def.'s Mot. Summ. J. 9, 30-31).  Genie correctly cites that a manufacturer may not be liable for failing to install an optional safety device if that safety device "interfere[s] with the overall utility of the product." *Jordan*, 1996 WL 662874, at *4 n.1.  Plaintiff, however, points to numerous facts evidencing that the implementation of a guarding device would *not* have interfered with the S-85's overall utility.  For example, Plaintiff cites to Genie sales literature stating that the OPS "offers excellent visibility and virtually no obstruction to the desired work area."  (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 9, at 4, DN 180-10).

Plaintiff also identifies an internal email in which a Genie employee acknowledges that its competitor made the OPA a standard feature on its units. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 20, DN 180-21).

### g. Evidentiary Challenges

Finally, Genie takes issue with some of Plaintiff's purported proof in two ways. First, Genie argues that some of the evidence Plaintiff relies upon is inadmissible evidence of subsequent remedial measures. (Def.'s Reply Mot. Summ. J. 1, 5-7). Specifically, Genie argues that evidence of the actions Genie took after the subject accident to prevent operator injury should be excluded. "Under Rule 407 of the Federal Rules of Evidence, subsequent design changes are not admissible to prove a design defect, *but may be admitted to prove the feasibility of precautionary measures, if disputed*." *Siegel v. Dynamic Cooking Sys., Inc.*, 501 F. App'x 397, 405 (6th Cir. 2012) (citing *Bauman v. Volkswagenwerk Aktiengesellschaft*, 621 F.2d 230, 233 (6th Cir. 1980)) (emphasis added). But Genie *has* disputed the feasibility of the mandatory implementation of anti-entrapment devices, claiming anti-entrapment devices "can be useful tools in some environments, [but] can negatively impact utility in others." (Def.'s Mot. Summ. J. 9, 30-31). "[M]ost courts read the feasibility exception . . . more broadly to apply where the defendant claims only that a remedial measure was not technologically feasible or cost effective." 23 Wright & Miller, *supra*, § 5289 (citations omitted). Genie's request to prohibit evidence of subsequent remedial measures in this instance is therefore unavailing so long as it asserts feasibility as an excuse for selling this boom lift without an available safety device.

Genie's second evidentiary challenge is that some of Plaintiff's proof of substantially similar accidents is inadmissible. (Def.'s Reply Mot. Summ. J. 1, 5-7). Specifically, Genie wishes to exclude evidence of other entrapment deaths. "[P]rior accidents must be 'substantially similar'

to the one at issue before they will be admitted into evidence. Substantial similarity means that the accidents must have occurred under similar circumstances or share the same cause." *Rye v. Black & Decker Mfg. Co.*, 889 F.2d 100, 102 (6th Cir. 1989) (citations omitted). The trial court has great latitude in admitting or excluding evidence of prior and subsequent accidents to show causation and danger of the product. *Bush v. Michelin Tire Corp.*, 963 F. Supp. 1436, 1451 (W.D. Ky. 1996); *Rye*, 889 F.2d at 101-02.

Smith's Report includes a compilation of entrapment death accidents. (Smith Rep. 19-20; Smith Rep. Ex. D, at 1-4). According to the descriptions of the accidents and reasonable inferences made therefrom, the cited entrapment death scenarios have numerous characteristics in common— operators standing in the basket of the lift, working in high areas, becoming crushed between an overhead obstruction and the basket, usually the control panel, while the location of the basket was changing. (Smith Rep. 9, 35; Smith Rep. Ex. D, at 1-4). Notably, there was no evidence of a machine malfunction in any of these cited accidents. (Smith Rep. 35; Smith Rep. Ex. D, at 1-4). All of the comparator entrapment deaths and injuries shared the same cause as well—an operator changing the location of the basket, exposed to obstacles that crushed the operator between such obstacles and the basket. According to Plaintiff's proof, the root cause of the cited entrapment deaths is evidenced by the fact that the entire boom lift industry developed anti-entrapment devices targeting that root cause in an attempt to eliminate the danger. *See Clark v. Chrysler Corp.*, 310 F.3d 461, 473 (6th Cir. 2002), *overruled on other grounds as recognized by Reynolds v. Freightliner LLC*, No. 05-70-GFVT, 2006 WL 5249744, at *9 n.12 (E.D. Ky. June 21, 2006) ("The substantial similarity rule does not require identical products; nor does it require us to compare the products in their entireties. The rule requires substantial similarity among the variables relevant

to the plaintiff's theory of defect."). At this juncture, it appears Plaintiff's evidence of other accidents will be admissible.

At the end of the day, Plaintiff has established genuine issues of material fact that must be resolved by a jury. Genie's motion for summary judgment will be granted as to Plaintiff's manufacturing and failure-to-warn defect claims, but denied as to those product liability claims based on design defect.[15]

### 2. *Defendant's Motion for Partial Summary Judgment*

In addition to challenging the merits of Plaintiff's claims, Genie moves for partial summary judgment on Plaintiff's claim for punitive damages. (Def.'s Mot. Partial Summ. J. 1). "In order to justify punitive damages, there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others." *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389-90 (Ky. 1985). "Even when a single act of negligence might not constitute gross negligence, gross negligence may result from several acts." *Id*. at 338. "The threshold for the award of punitive damages is whether the misconduct was 'outrageous' in character, not whether the injury was intentionally or negligently inflicted." *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co.*, 277 S.W.3d 255, 267 (Ky. App. 2008) (citation omitted). Reckless disregard for the rights of others may be implied from the nature of the misconduct. *Id*. It is the flagrant indifference to the safety of others that justifies an award of punitive damages. *See Bowling Green Mun. Utils. v. Atmos Energy Corp.*, 989 S.W.2d 577, 581 (Ky. 1999). Moreover, to support an award of punitive

---

[15] As a final matter, Plaintiff seeks to file a sur-reply to clear up a discrepancy about the testimony of Rasnic in another case regarding the design defect of the S-85. (Pl.'s Mot. Leave File Sur-Reply 2-3). Because the Court has already ruled in Plaintiff's favor on the claim addressed in the proposed the sur-reply, this motion will be denied as moot. *See Alfaro v. Outback Steakhouse of Fla., LLC*, No. 1:18-CV-00009-GNS-HBB, 2018 WL 5636159, at *4 (W.D. Ky. Oct. 31, 2018).

damages Kentucky law requires a finding of a failure to exercise even slight care. *See Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51-52 (Ky. 2003). "The plaintiff must establish the reckless or wanton disregard for others by clear and convincing evidence. *Colyer v. Speedway, LLC*, 981 F. Supp. 2d 634, 645 (E.D. Ky. 2013) (citing *Embry v. Geo*, 478 F. Supp. 2d 914, 920 (E.D. Ky. 2007)).

There are genuine issues of material fact in this case that preclude summary judgment regarding punitive damages. Plaintiff has identified evidence upon which a jury may find that Genie was grossly negligent in selling the S-85 without an anti-entrapment device. Genie's actions before and after the sale of this S-85 in January 2010, coupled with its alleged knowledge of the risk of crush injuries such as Decedent's and rejection of two potential anti-entrapment devices, could suggest a reckless disregard for the safety of its S-85 operators. Even with knowledge of potential crushing accidents as early as 1994 and in the face of several prior similar incidents involving serious physical injury and death, Genie declined to use an anti-entrapment device it knew about long before Genie sold this S-85. (Smith Rep. 19-23; Smith Rep. Ex. D, at 1-4; Def.'s Mot. Exclude Smith Ex. 16, at 1-2). In the wake of multiple further entrapment deaths, communications among Genie employees suggest that Genie consistently lagged behind the industry in its development and standardization of anti-entrapment devices. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 20, at 2; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 21, at 2; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 22, at 2). Genie's excuses for its lag, mostly the feasibility of the implementation of anti-entrapment devices, are refuted by Smith. (Smith Rep. 27, 30-32, 35, 37-42; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 8).

Genie claims that its compliance with industry standards precludes any punitive damages liability it may owe to Plaintiff. (Def.'s Mot. Partial Summ. J. 20-21). However, "mere

compliance with regulatory products standards, either mandatory or voluntary, does not automatically foreclose a punitive damages jury instruction." *Nissan Motor Co., Ltd. v. Maddox*, 486 S.W.3d 838, 843 (Ky. 2015).

Genie also proposes that the testing conducted on the S-85 eliminates punitive damages liability. (Def.'s Mot. Partial Summ. J. 21-22). Yet, "[i]n . . . cases involving severe permanent injury and a manufacturer's grossly deficient testing, comparable punitive damage awards have been upheld." *Sufix, U.S.A., Inc. v. Cook*, 128 S.W.3d 838, 842 (Ky. App. 2004) (citations omitted). Product testing is simply one of many factors to be considered by the trier of fact in determining whether punitive damages can be awarded. *Maddox*, 486 S.W.3d at 843. Genie does not articulate why its testing of the S-85 outweighs consideration of the facts supporting Plaintiff's claim for punitive damages. A jury could certainly conclude that Genie acted recklessly in deciding not to include any anti-entrapment device on its boom lift. Plaintiff has satisfactorily met her burden of establishing a genuine issue of material fact as to whether Genie acted with the requisite mental state warrants imposition of punitive damages, precluding summary judgment for Genie on this issue.

## IV.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that:

1.  All parties' motions to exceed page limits (DN 159, 166, 182) are **GRANTED**.

2.  Plaintiff's Motion to Seal (DN 183) is **GRANTED**, and DN 184 shall be sealed.

3.  Defendant's Motion for Summary Judgment (DN 164) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's product liability claims based on manufacturing and failure-to-warn defects are **DISMISSED WITH PREJUDICE**. Plaintiff's product liability claims based on design defects **SURVIVE**.

4.      All parties' motions to exclude each other's expert witnesses (DN 157, 160, 161, 162, 169), and Defendant's Partial Motion for Summary Judgment (DN 167) are **DENIED**.

5.      Plaintiff's Motion for Leave to File Sur-Reply (DN 197) is **DENIED AS MOOT**.

cc:     counsel of record